16-1106 Mr. Zalesny. May I proceed, your honor? You may. May it please the court, Steve Zalesny for Appellant Duke University. With the court's permission, given limited time, I'm going to focus my argument today on the two dependent claims that are developed in the briefing, Claims 9 and 19. Time permitting, I may make some comments about Claim 1 as well. I'd like to begin with Claim 19, which as the court knows, has a rather unusual procedural history. This is a claim on the prophylactic use of an immunosuppressant to prevent the occurrence of an immune reaction to this enzyme that's the subject of this patent. Well, it's interesting that you're leading off with Claim 19. I understand why, and we'll let you get to that eventually. But Claim 9 goes back to Claim 1, and Claim 1, which is certainly part of your appeal, deals with treating Pompe's disease with an enzyme obtained from Cho cells. That's correct, your honor. And why isn't this all in Van Brie? Van Brie, the 410 Van Brie patent, is entitled, I believe, a method or... Yes, but we look at more than the title. We look at the description. Understood. There are a number of, I would say, passing references to Cho cells as an alternative source of enzyme to the transgenic mammals that are the focus of the Van Brie patent. Biomarin's experts testify that they understood the disclosure in Van Brie and the prophetic clinical trial and prophetic results in Van Brie to relate to the enzyme obtained from transgenic mammals. And to the extent there's a disclosure in Van Brie of Cho cells is essentially to criticize or belittle Cho cells as an inferior source of enzyme because, according to Van Brie, that source is more difficult to work with. It's not as efficient to propagate the enzyme in that fashion. There's other prior art that we've patent, which is much more important, I would say, because it showed that the Cho cell material had very little of this important glycosylation element, the mannose 6-phosphate, or M6P. And in this court's decision last year in the related case of Genzyme versus Biomarin, the panel in that case recognized that M6P was absolutely critical to effective or therapeutic use of the enzyme. And the prior art that existed prior to Dr. Chen's 7.1.2 patent showed that the Cho enzyme had very little M6P. So it's our contention that... and Cho cells are there as an alternative. I agree that they are there, Your Honor, but the question is whether a person of skill in the art, ordinary skill in the art, would have been motivated to substitute Cho cells in the therapeutic use of the enzyme for what is claimed to be superior material. The question is not... an anticipation question is not a motivation question. I think the question is whether when Van Brie says, give a therapeutic dose of the mouse milk version of this, and then says a couple of places, you can get the same stuff from a different source, that a skilled artisan would read that to disclose, among other things, the same process that Van Brie talks about with the mouse milk version as using the Cho version. That's correct, Your Honor. And I was answering from the standpoint of obviousness, but there is an anticipation finding. And on anticipation, I believe that the way this case was originally pled or pitched, petitioned to the Board, was that the Cho cell claim in... or the Cho cell element of Claim 1 in the Chen patent was a so-called product by process claim, which essentially made it irrelevant. That's your ultra-various argument, which even if we agree with you, and it's a pretty good argument, but it's one that we can't review anymore after proposal, right? Understood, but... So assume we're stuck with the fact that they took it, despite the fact that it was a product by process reference in the petition. Right. Then what? Then you're left with the question, I think, of whether a passing and denigrating reference in a single reference, now Van Brie, and we're not talking about other references that describe Cho cells and the ability to produce them efficiently, but a passing and denigrating reference in Van Brie to Cho cells is anticipatory of therapeutic use of enzyme derived from Cho cells to produce a cure, or rather a treatment, for a previously untreatable disease. And I would say that that is simply not an adequate disclosure of... There's no disclosure in Van Brie of a therapeutic use of Cho cells periodically at an administration interval to treat effectively this disease. Assuming, just for the sake of argument, that that disclosure, that passing reference disclosure of Cho cells is enough, is there in Van Brie any disclosure of precursor-only methodology as described in Claim 9? No. So in Claim 9, which was invalidated on both anticipation and obviousness grounds, you have a statement in Van Brie that the enzyme is preferentially, predominantly, that is greater than 50 percent in the precursor form. There is no disclosure of what the board agreed with Appellant Duke University was the claim, the essence of Claim 9, which is that the enzyme is in exclusively precursor form. Claim 9 doesn't say exclusively? It says is a precursor, Your Honor. A precursor. Is a precursor. A precursor. And as you read, column 13, lines 48 or thereabouts, 49, describes a precursor. In Van Brie. In Van Brie, yes. But, Your Honor, the way the board ultimately construed Claim 9. But you're saying that Van Brie describes a precursor only in combination form? Correct. It's a mixture. It describes a mixture of precursor and non-precursor. It does not describe a pure or 100 percent or exclusively precursor. And to take the phrase in Claim 9, which was, quote, is a precursor, and read it as the board did to say is or is not a precursor, is not a logical or sustainable interpretation. And the board's rationale was predicated on the preamble, if you will, to Claim 1, which was that it's a method claim, obviously, that includes a number of steps. And it uses the word comprising to introduce those steps. And when we get to Claim 9, which adds a narrow limitation, is a precursor, the introductory preamble to Claim 1, from which 9 depends, begins with this open language of comprising, and that allows for additional method steps, including the co-administration or simultaneous administration of non-precursor form. Why don't you get to Claim 19 that I think you wanted to address? If I could just finish on this one point on Claim 9. So this court, and both Judge Lurie and Judge Taranto have both written opinions in the last year on this issue of comprising and how it does not open up. It's not a weasel word that opens up. Comprising is decades old. Exactly. So the law here, which I believe the board simply got wrong, is that the word comprising does not allow for the performance of that particular method step where the enzyme is a precursor to be performed by administering both precursor and non-precursor. You could perform it by a number of other means, injecting it with a hypodermic needle, but you can't perform that step with a non-precursor enzyme along with precursor. So now I'll return, with the court's permission, to Claim 19 on the prophylactic use of immunosuppressant. So, as the court knows, in the original final written decision, the board unanimously invalidated that claim as obvious over primarily a reference called Brady, which had to do with the immunosuppressive. And then re-hearing this at oops, let's forget about Brady. Correct. But we think that since using an immunosuppressant when you see a problem is something everybody would do, if collectively you see enough of the problems, then you would start giving it to everybody ahead of time. Correct. And they said it's a predictable variation or it's common sense. So let's look at what the state of the art on this enzyme was because in Brady it is said. Well, just answer this for me. Why, I guess, why does it matter whether anybody thought it was going to be likely or not very likely that a large number of the recipients of this enzyme would have antibody problems? But why isn't it enough for the board to say there are two options here. You either give the immunosuppressant as a prophylactic matter or you don't. You do when, after you've given this enzyme to a sufficient number of people, it is clear that quite a lot of them get the antibody problem. And then you would do it prophylactically. Either or choice, we don't know if the second option is going to come to fruition. But if it does, this is what everybody would do. And the logic would seem straightforward, Your Honor, but we have to remember a number of things. First, immunosuppressants are serious drugs that have serious side effects. You don't simply give them lightly as prophylaxis. Second, immune reactions to recombinant proteins were rare and occurred in, quote, very few patients. That's the prior art according to Brady, and there's no contrary prior art. Third, as of the time of this invention, there's no record, there's no prior art of any administration of this enzyme, recombinant choform enzyme, to any patient or any other recombinant, GAA, to any patient on earth. Dr. Chen is the first person, first physician to do that. And in his, it's only three studies, excuse me, three patients described in his specification. The study was eventually expanded. But he sees in patients one and two not only immune responses, but a quick onset within three weeks, which is very different from Brady. Brady, the patient, didn't even develop the antibodies for a year and wasn't administered an immunosuppressive regimen until two years later. So Dr. Chen sees this. He puts it in the specification, quick onset of immune response in antibody titers and lack of efficacy as those antibody titers rise. And he concludes that this is a serious issue with this enzyme and this disease. And he teaches the medical community about both of those things. And he proposes a solution. Let's premedicate them with immunosuppressant, even though there's no prior art disclosure whatsoever to do that in this context, that is enzyme replacement therapy or elsewhere. There's absolutely no disclosure anywhere in the prior art of that. And it works. So if that's not an invention, really what is? He discovered a problem that was not known to exist, and he found a solution for it. And on this record, as Judge Bonilla said, Judge Bonilla, of course, was the author of the original majority opinion, but she said, I think quite correctly, that there's nothing other than empty conclusory statements in the record to support a conclusion that this was either obvious or a predictable variation on the prior art. Can I ask you one informational question, which may or may not be relevant? Does the product label here say anything about prophylactic immunity? I believe it certainly describes immune reactions, and I believe it does describe co-administration or pre-administration. So this is a gift from Duke University and Dr. Chen to the medical community, which the community has relied upon. It's a bona fide invention, and this court has said a number of times that while common sense has its role, obviously, in patent law, it has its limits as well. And it's very unusual that it can substitute for prior art when we're talking about two things. Number one, a missing limitation from the prior art, and that's prophylactic use of the immunosuppressant. And number two, the essence of the invention, which that is the essence of Claim 19. It may not be the essence of Claim 1, obviously, but for Claim 19 the essence is prophylactic use that is absent from the prior art. Common sense is not a substitute for that type of an invention. Counsel, you've consumed what you wanted to say for rebuttal, but we'll give you three minutes back anyway. Thank you, Your Honor. Actually, if the court doesn't have any other questions at this time, I will. Oh, I'm sorry. I used my entire rebuttal. You have used your time. Okay, I misread the clock. As a gift, three minutes. I gratefully accept your gift of the three minutes. Thank you, Your Honor. After Mr. Murphy speaks. Okay, maybe I'll just start with the claim. Excuse me. My name is Gary Murphy. I represent Biomarine Pharmaceuticals, and I would like to start with Claim 19. Take it the reverse order that we had earlier, if that's okay. Okay. So on the immunosuppressant issue, counsel even acknowledged that the logic of using an immunosuppressant is straightforward. And Dr. Pastoris laid that out in his declaration very clearly. He had a whole section of his declaration that talks about immunosuppressants. The record is clear that immune responses were observed with other therapeutic proteins. It's a very common problem. Even Duke's own witnesses admitted it during cross-examination during depositions. Well, first let me start. I mean, Judge Bonilla did lay this out in a lot of detail. First of all, it is true that this new predictable variation theory is really one that is adopted sua sponte by the board. I mean, the petitioner never urged it. You never urged that theory. You said Brady did it. You said it was in Brady. Early on, yes. Early on, but as the record developed, we did actually urge it prior to that decision. I can point to the record where the issue was raised specifically. If you could give me two seconds here. Because the majority did not dispute that it wasn't raised. They just said, well, we can do it anyway. Okay, so let me just go back to was it raised or not. The first point is the board noted that the patent owner had previously argued that a person of ordinary skill in the art, I'm quoting a person of ordinary skill in the art, could not have predicted that an immunosuppressant could be useful when the active form of CHO-GAA is used to treat Pompe patients. That's A9. So the board actually noted that the patent owner raised that argument, referring to A9, citing the petitioner's reply and the patent owner's response. And then in BioMarin's opposition to Duke's request for rehearing, BioMarin argued, and this is on A404, when there are a finite number of identified predictable solutions, it is obvious to select a particular dosing schedule, see Hoffman-LaRoche versus Apitech citing KSR. That's on A404. Tell us about Claim 1. Your opposing counsel has disparaged the reference to CHO cells. That's not true at all. I mean, if you look at, we're talking about VanBree. VanBree. Right. So VanBree is a method for, claims a method, discloses and claims a method for treating Pompe disease, using the exact same enzyme that's the subject of the patent issue. If you look at the actual work that they did, they made it. But from a different source. Pardon me? But from a different source. Yes, so if you look at the actual experiments, they made it from transgenic animals. So the actual work, you know, hands-on work they did, they made that enzyme, and that was what their laboratory was working with, and they used it to set up their clinical trials. But, of course, one doesn't need a reduction to practice to be a disclosure. Absolutely. And they said, you know, this is what they. So we have to look at VanBree from the perspective of one of skill in the art. Yes. All right, so where did you present, or did the board rely on expert testimony to say what one of skill in the art would have understood VanBree to disclose? So our witnesses did not testify about VanBree for that 102 ground. They testified on obviousness. Right, so how do we allow a 102 obviousness when there was no one to say what one of skill in the art would interpret VanBree to mean, except the experts who said one of skill in the art would not interpret VanBree to mean this? Right. So our experts gave, both experts, we had a production expert, Dr. Krogan, who gave, you know, pages and pages of declaration testimony. Was that one of the ones that they moved to exclude? I don't think they moved to exclude Dr. Krogan's. They might have, but. There were two experts at the board who specifically said they weren't going to rely on it at all. Two of yours. They weren't going to rely on that part of the testimony, I guess. Dr. Krogan, I don't remember about the motion to exclude right now. But you're conceding that you did not put in any expert testimony on VanBree and what one of skill in the art would have understood VanBree to say. So we didn't put in expert testimony on VanBree, but our experts did provide a lot of factual information to educate the board from a production expert and from Dr. Pastoris, who's a medical doctor. He was our main expert on a person of ordinary skill in the art. So we had plenty of testimonial evidence and evidence to inform the board of what the state of the art was and help them read the prior art through the eyes of an ordinary person or person of ordinary skill. But if you really thought a person of ordinary skill in the art would believe VanBree anticipated, why didn't you put your expert on to say that? Because we focused on the 103. You must have been pretty surprised when the board came up with the 103. Not at all, because that was our first grounds of invalidation. Not at all. To the point that the 102 reference speaks for itself, whereas obviousness has a lot of motivation issues. The PTAB judges are used to reading patents. I mean, you can see it right there. I'm sorry, the right there is column... In VanBree. There's a lot of VanBree. The bottom of column 13. Is that what we're looking at? Okay. Therapeutic methods. The present invention provides effective methods of treating Pompe's disease. We're going to give this glucosidase, the human acid alpha glucosidase. Such human acid alpha glucosidase is provided from, for example, the transgenic animal described in the examples, preferably more predominantly precursor. And then it says, given the successful results with human acid alpha glucosidase in the transgenic animals discussed in the examples, it is possible that other sources of human alpha glucosidase, such as resulting from cellular expression systems, can also be used, for example, CHO. I don't have that. Yeah, there's multiple references to CHO cells. Yes, that's one of them for certain. There's a later one that refers to certain in vitro tests and says something about CHO having the restoration of the endogenous acid glucosidase activity is the same CHO. Yeah, we laid it all out in our brief, but basically VanBree clearly teaches that CHO cells are an alternative. I think the record is clear. Eighty percent of all therapeutic proteins that are ever made were made in CHO cells. This teaching of VanBree, they kind of went off on their own. They did their thing. They actually found another way to make it, which was in transgenic animals. But you can't rewrite history. Eighty percent of all therapeutic proteins ever approved by the FDA were made in CHO cells. And VanBree acknowledged, oh, you can make them in CHO cells also. But that doesn't mean that for this particular enzyme, what has a therapeutic effect, which is a claim requirement, is independent of the source of the enzyme, does it? How do we know that? Because VanBree tells you that they're the same. You were just reading some of the disclosures in VanBree. It says it's possible. It's possible that you could do the same thing with the enzyme from a different source. Right. And it also says that the activities, as best they could tell, as best they had studied, were the same. The activities between both sources. There's specific quotes in VanBree. What about Claim 9? Claim 9? The question is whether the disclosure of precursor, which is only predominantly anticipates Claim 9, which refers to a precursor. So we're talking about VanBree, right? VanBree. Claim 9? Okay. That's the argument your opposing counsel made. Right. The board found that Claim 9 requires exclusively precursor. Right. Does VanBree disclose exclusively precursor? First of all, I hope you don't think we're conceding that Claim 9 should be interpreted narrowly. We rely on our brief and we think the board got the claim interpretation right. It should not be narrowly interpreted. There's no case law on that point. But let's assume for purposes of discussion the court wants to interpret Claim 9 narrowly. I will point to A476, which is the VanBree patent, Column 4, Lines 24 to 28. It says, and it teaches purification of the drug. This is well known prior to VanBree. VanBree teaches purification of the drug. What lines are those? A476, Column 4, Lines 24 to 28. Most preferably the object species is purified to essential homogeneity. Then at A481, small amount of impurities could be tolerated. That's Column 13, Lines 13 to 20. And then if you look for in the examples, detailed purification procedures are reported in Example 3 on A484. So VanBree has a lot of disclosure about purification. I'm sorry, maybe this is so obvious I should note the answer. What is the relationship between purification and precursor? So I guess in the context of Claim 9, if you interpret Claim 9 to be limited to only the precursor and no other forms of the protein, you're going to want to purify the precursor. I mean if that's the way you interpret it, then VanBree clearly teaches that the precursor is the active form. VanBree, all of the prior art, all across the whole record, teaches that the precursor is the active form. When you're developing a drug, you want to purify the active form and give it to the patient. You don't want to give them something... Is there such a thing as a purified precursor? So let me just do a visual here. So the molecule is a protein. It's a long protein. And the precursor, at one end of the protein, there are these phosphate, sugar and phosphate groups. And the precursor form, it's the whole molecule. It has a certain molecular weight. Now, if the drug, after it's expressed and certain things happen to it, it can fall apart. And enzymes can clip it off. And so this is the precursor initially. Enzymes can come along and ruin it, and they can chop off parts off the end. So then you might end up with a mature form with not having this little important part on the end. So the precursor was the active form, and you want to purify that. You don't want to give the patient the inactive form, the mature part that's been cleaved off. All right. So where in the record did you present expert testimony that said that you have to understand that once there's this reference to CHO being a possibility, that therefore you have to go back and figure out that if you're going to have any purification, that therefore it would also mean that you would purify it so as to use a precursor only? I mean, that's a pretty big leap. Both of our witnesses testified that when you're developing a drug, you're going to get the active form, and you're going to purify it. The precursor is the active form. It's in VanBree. It's in Roycer. It's in both of our expert declarations. Did the board find that VanBree shows a precursor only treatment mechanism, or just say that's not? I thought the board said it's not necessary because we read the comprising language. They didn't go the extra step. They didn't think it was necessary to delve into that all the way because they were interpreting the claim broadly to include administering both the precursor form and the non-precursor form. As long as you have an effective amount of the precursor, it doesn't matter if there's something else in there. In the ideal world, you're going to purify it. The FDA is going to want you to purify it. So they didn't go the extra step and go through VanBree and point to the other parts. Claim nine says eight precursor, and however the board construed it, that's a question of law, which we can review day no go. I'm sorry. Yes. And claim and column 13 of VanBree discloses a precursor. So I'm not sure what was the question. I was commenting. Okay. I was commenting. You have a little time left if you wish to finish up. So I guess on the ‑‑ I'm surprised this purification issue has come up. So I want to just do that, explain that a little bit more if I could. So claim nine, it's irrelevant whether it's purified completely or not if you accept the board's interpretation of claim nine because the is argument and the precursor argument is all about purification. You get the active form. Everybody, both sides agree that the precursor is the active form in the enzyme. All the testimony of all the witnesses. And you can see it right in VanBree, you can see it right in Royster, and you can see it in both declarations of our witnesses, probably the declarations of their witnesses also. So the precursor is the active form. If you accept the board's interpretation that it doesn't have to be completely pure, then we don't need to worry about this purification issue. If you take a very narrow interpretation of claim nine, then the question is does VanBree actually teach purification. And I pointed to where it says you purify the active form, which is the precursor to essential homogeneity. You want the drug to be pure. You don't want the bad stuff in there. And that's the same. Royster has the same teachings. You always purify a drug, and there's plenty of testimony on that point. I think the board didn't go the extra step because they didn't think they needed to. Thank you, counsel. Mr. Zaleson has some rebuttal time. Thank you very much, Your Honor. Just a couple of points. On claim one and VanBree, to be clear, there is no disclosure in VanBree of therapeutic efficacy of any data demonstrating therapeutic efficacy of GAA from any source. It's a prophetic disclosure. The only human testing that's described is volunteer normal testing for safety and dose ranging. Well, VanBree says it's for treatment of patients with pulpy disease. He says that. He does. As to the transgenic mammal material. That's a statement that matches what's in your claim. Well, what's in our claim is the therapeutic treatment, effective therapeutic treatment using CHO material administered periodically. You're saying that Bree didn't prove it. He didn't prove it. That's not necessary for a description. He does not describe therapeutic efficacy using CHO material. I would say he doesn't even do it for the other material, but he doesn't do it for CHO. On claim nine, just to pick up on some of the panel's questions, there is no finding by the board of a disclosure either in VanBree or elsewhere of any GAA use in exclusively precursor form. Did the petitioner argue that to the board? No. I did not see any such argument. That might make a difference in whether if we were to disagree with the board's claim construction, which is a legal issue, whether there's anything to remand on the question or whether it would be an outright reversal on claim nine. So two things, Your Honor. On the issue of anticipation, there was no argument below that there's a disclosure of exclusively precursor. There was also no contrary claim construction put forward in response to Duke's proposal, which was adopted by the board, that it required exclusively precursor. So on the anticipation finding, I believe that that argument is waived and there is no basis for remand. What about the obviousness? On the obviousness, one could make the argument that, as they found with claim 19, that if VanBree discloses preferably, predominantly precursor, that you could go the rest of the distance and fill in the blank. I'm sorry. VanBree is not part of the obviousness. I'm sorry. You're right. But for Roycer, I believe, same disclosure. Same disclosure. Same disclosure. So if Roycer advocates predominantly precursor, one could argue you could – Did the petitioner make that argument? I do not believe the petitioner made that argument, Your Honor, because they did not address the issue of exclusively precursor either in the petition or in their reply. So there's just no showing on that. And, in fact, to remand for that purpose would put us in essentially the identical position we're in on claim 9, where they'd be trying to rely on common sense to fill in a key missing claim limitation that's the essence of the invention. And we believe that would not be appropriate or necessary. It should be a straight reversal. Thank you, counsel. Thank you, Your Honor. We'll take the case under advisement.